UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ALLAN MONGA, and PORTLAND PUBLIC SCHOOLS, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:18-cv-00156-JAW |
| | ) | |
| NATIONAL ENDOWMENT FOR THE ARTS, JANE CHU, CHAIRMAN OF NATIONAL ENDOWMENT FOR THE ARTS, and THE POETRY FOUNDATION | ) ) ) ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| THE MAINE ARTS COMMISSION | ) | |
| | ) | |
| Party-in-Interest. | ) | |

## AMENDED[1] ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER

A high school student and the public school district in which he is enrolled seek

emergency injunctive relief in the form of a temporary restraining order and a

preliminary injunction against the National Endowment for the Arts (NEA), its

Chairman, and an independent literary organization to permit the student to

participate in a national competition operated by the Defendants scheduled to begin

on April 23, 2018—a mere three days from now.  The Plaintiffs allege that the NEA

---

[1]     As the Court was pressed for time to issue this opinion during the afternoon of April 20, 2018, it was unable to thoroughly proofread the opinion before it was issued.  Accordingly, the Court issues this amended opinion to correct certain non-substantive, clerical errors that inadvertently appeared in the original order.

and its Chairman's enforcement of an eligibility rule violates the student's Fifth and Fourteenth Amendment rights to equal protection by discriminating against him on the basis of his immigration status and national origin. The Plaintiffs also argue that the literary organization's enforcement of the eligibility rule violates Title VI of the Civil Rights Act of 1964. In their motion, they seek only to preserve the student's opportunity to compete in the national competition. The Defendants oppose the motion, arguing that the eligibility rule survives even strict scrutiny and that, thus, the Plaintiffs cannot show a likelihood of success on the merits, dooming their motion.

The Court grants the student's motion for temporary restraining order because it concludes that the Plaintiffs are likely to succeed on the merits, that the student would suffer irreparable harm but for an injunction, and that the balance of the relevant impositions and the public interest tip toward the student's position.

## I.    BACKGROUND

### A.    Procedural Background

On April 11, 2018, Allan Monga and Portland Public Schools (PPS) filed a complaint and a motion for temporary restraining order (TRO) and preliminary injunction. *Compl.* (ECF No. 1); *Mot. for TRO and Prelim. Inj. with Incorporated Mem. of Law* (ECF No. 3) (*Pls.' Mot.*). Two days later, on April 13, 2018, the Court held a telephone conference with the parties. *Min. Entry for Telephone Conference* (ECF No. 17). On April 16, 2018, the NEA and its Chairman, Jane Chu, filed their response in opposition to the motion for TRO and preliminary injunction. *Defs. National Endowment for the Arts' and Chairman Jane Chu's Opp'n to Pls.' Mot. for*

TRO and Prelim. Inj. (ECF No. 23) (*uncorrected NEA Opp'n*). The Poetry Foundation (TPF) filed its opposition on April 16, 2018 as well. *Def. The Poetry Foundation's Resp. to Pls.' Mot. for TRO* (ECF No. 21) (*TPF Opp'n*). On April 17, 2018, the Plaintiffs filed their reply. *Pls.' Reply in Support of Mot. for TRO and for Prelim. Inj.* (ECF No. 24) (*Pls.' Reply*).[2] The Court held an oral argument on April 18, 2018 at which counsel for the Plaintiffs confirmed that logistically for the student to attend the Washington D.C. competition, the Court would have to issue an order by Friday, April 20, 2018.

## B.     Factual Background

### 1.     The Parties

Allan Monga is a resident of Westbrook, Maine. *Compl.* ¶ 2. Mr. Monga is an eleventh-grade student enrolled at Deering High School (Deering), which is part of PPS. *Compl.* ¶ 2; *Pls.' Mot.* at 3-4. There, he has distinguished himself as an extraordinary poet. *Id.* ¶ 21. He was born in Zambia in December 1998. *Compl.* ¶ 18; *Pls.' Mot.* at 3. In 2017, he fled Zambia to seek asylum in the United States and relocated to Portland, Maine. *Compl.* ¶ 18; *Pls.' Mot.* at 3. Mr. Monga has filed an asylum application with United States Citizenship and Immigration Services. *Compl.* ¶ 19. He has an Employment Authorization Card, currently authorizing him to work through February 2020, and a Social Security Number from the Social

---

[2]     Later on April 17, 2018, the NEA filed an unopposed motion for leave to file a corrected brief. *Unopposed Mot. for Leave to File Corrected Br.* (ECF No. 25). On April 18, 2018, the Court granted the motion, *Order* (ECF No. 26), and the Court heard oral argument. *Min. Entry for Hr'g* (ECF No. 27). Shortly after oral argument, the NEA filed its corrected brief. *Defs. National Endowment for the Arts' and Chairman Jane Chu's Opp'n to Pls.' Mot. for TRO and Prelim. Inj.* (ECF No. 28) (*NEA Opp'n*).

Security Administration. *Id.*; *Pls.' Mot.* at 4. If and when his asylum application is approved, Mr. Monga plans to apply to be a permanent resident. *Compl.* ¶ 20.

PPS is the public school district in Portland, Maine. *Id.* ¶ 3. A significant percentage of the students who attend school in PPS are immigrants without permanent resident status, and PPS has a stated interest in ensuring that all of its students, including its immigrant population, are all treated fairly and are not discriminated against in the provision of educational opportunities. *Id.* ¶ 4. Deering is one of three public high schools operated by PPS. *Id.* ¶ 5. Deering's population includes a significant number of immigrant students. *Id.*

The NEA is an independent federal agency that funds, promotes, and strengthens the creative capacity of our communities. *Id.* ¶ 6. The NEA is located in Washington, D.C., and Jane Chu is its Chairman. *Id.* ¶ 7.

TPF is an independent literary organization committed to promoting poetry through discovering and celebrating the best poetry, placing it before the largest possible audience, and encouraging new kinds of poetry. *Id.* ¶ 8. TPF is located in Chicago, Illinois. *Compl.* ¶ 8.

The Maine Arts Commission (MAC) is a state of Maine agency that supports artists, art organizations, educators, policymakers, and community developers in advancing the arts in Maine. *Id.* ¶ 9. The Plaintiffs named MAC as a party-in-interest to the extent that its presence in the lawsuit is necessary to afford Plaintiffs the relief they request. *Id.* No other relief is requested against the MAC. *Id.*

### 2. Poetry Out Loud and the Eligibility Rule

The NEA, TPF, and the MAC operate as partners in administering Poetry Out Loud (POL), an educational program integrated into school curriculums as a poetry-reading contest.  *Compl.* ¶ 12; *Pls.' Mot.* at 2-3.  The NEA describes POL as follows:

> A partnership of the NEA, [TPF], and the state arts agencies, [POL] is a national arts education program that encourages high school students to learn about great poetry through memorization and performance. [POL] offers educational materials and a dynamic recitation competition to high schools across the country.  Students select, memorize, and recite poems from an anthology of more than 900 classic and contemporary poems.  In this pyramid structure competition, winners advance from classroom recitation contests to school-wide competitions, then to the state competitions and, ultimately, to the national finals in Washington, DC.

*Compl.* ¶ 13; *Pls.' Mot.* at 2-3; *see NEA Opp'n* at 4.  Schools register with their state arts agency and implement the uniform curricula provided by the POL program, leading to poetry recital competitions within the participating schools.  *Pls.' Mot.* at 3.  POL uses a pyramid structure that starts at the classroom level.  *Compl.* ¶ 15. Winners advance to a school-wide competition, then to a regional and/or state competition, and ultimately to the national finals.  *Id.*  Each winner at the state level receives $200 and an all-expenses-paid trip with an adult chaperone to Washington, D.C., to compete for the national championship.  *Id.* ¶ 16.  The state winner's school receives a $500 stipend for the purchase of poetry books.  *Id.*  A total of $50,000 in awards and school stipends are given at the national finals, including $20,000 for the national champion.  *Id.* ¶ 17.  The awards are based solely on artistic merit.  *Id.* ¶ 18.

POL has an eligibility rule (the eligibility rule):

> Citizenship: In keeping with federal law, competitors at the state and national finals must be U.S. citizens or permanent residents with a valid tax identification or Social Security number.  Tax identification or Social

Security numbers are required to receive prizes, including cash payments or travel awards. Students are responsible for verifying their eligibility. This requirement has been in place since 2006.

*Compl.* ¶ 36; *NEA Opp'n* at 5. The eligibility rule is posted on the websites of the NEA, TPF, and the MAC. *Compl.* ¶ 37; *NEA Opp'n* at 4-5. The NEA states that this requirement "is either identical or nearly identical to those applied across all of NEA's funded programs." *NEA Opp'n* at 5.

Chairman Chu is the federal official in charge of enforcing the eligibility rule. *Compl.* ¶ 38. TPF is responsible for developing educational materials, producing a website, providing cash awards to winning students, and contributing towards the expenses of the national finals. *NEA Opp'n* at 4. The NEA is responsible for developing content of the program materials, awarding grants to state art agencies to implement the POL program, providing technical support to state arts agencies, and entering into a cooperative agreement with a qualified organization to manage the national finals event. *Id.* To fulfill its obligations under the agreement with TPF, the NEA entered into a Cooperative Agreement with the Mid Atlantic Arts Foundation "to support the 2018 national finals competition of 53 state and jurisdictional champions of the [POL] program, in conjunction with [NEA], [TPF], and the participating State Arts Agencies." *Id.* (citation omitted).

### 3.   Poetry Out Loud at Deering

Deering advertises POL each year by making announcements and hanging posters. *Compl.* ¶ 14; *Pls.' Mot.* at 3. Some English teachers incorporate POL into their lesson plans and ask all of their students to participate. *Compl.* ¶ 14; *Pls.' Mot.*

at 3. Deering has been participating in POL since approximately 2012. *Compl.* ¶ 22. Deering registers for POL through the MAC. *Compl.* ¶ 22; *see Pls.' Mot.* at 3. POL is an extension of Deering's English curriculum. *Compl.* ¶ 23; *Pls.' Mot.* at 3. Students learn skills that benefit their overall education including vocabulary, reading comprehension, constructing meaning, and public performance. *Id.* ¶ 23; *Pls.' Mot.* at 3.

### 4. Allan Monga Wins the School-wide, Regional, and Statewide Poetry Out Loud Competitions

As part of his high school education, Mr. Monga participated in Deering's POL competition. *Compl.* ¶ 24. He won the school-wide competition with his performances of "America" by Claude McKay, and "In the Desert" by Stephen Crane. *Id.* To prepare for the southern Maine regional competition, Allan practiced every day, before, during, and after school. *Id.* ¶ 25. He practiced with two teachers, Drew Pisani and Margaret Callaghan and on his own. *Id.* Mr. Monga performed three poems at the regional competition: "She Walks in Beauty by Lord" by Lord Byron, "The Song of the Smoke" by W.E.B. Du Bois, and "In the Desert" by Stephen Crane. *Id.* ¶ 26. He won that regional competition. *Id.* ¶ 27.

Mr. Monga's teachers, principal, and superintendent contacted the MAC and urged it to let him participate in the state finals. *Id.* ¶ 28. To prepare for the finals, Mr. Monga continued to practice before, during, and after school with two Deering teachers and the school's drama teacher. *Id.* ¶ 29. Prior to the state finals, Mr. Monga and PPS (through officials at Deering) informed the MAC that Mr. Monga was not a United States citizen or permanent resident. *Id.* ¶ 39. The Deering officials

nevertheless urged the MAC to allow him to compete in the state finals. *Id.* ¶ 39. On March 7, 2018, the MAC contacted the NEA indicating that Mr. Monga wished to compete in the state finals but that he was not eligible due to his immigration status. *NEA Opp'n* at 5 (citing *uncorrected NEA Opp'n* Attach. 1 *Decl. of Tony L. Chauveaux* (*Chauveaux Decl.*); *uncorrected NEA Opp'n* Attach. 3 *Decl. of Michael Griffin*, ¶¶ 2-6 (*Griffin Decl.*)). In response, the NEA "reiterated that participants at the state competition must satisfy the [POL] eligibility criteria to compete at the state and national levels." *NEA Opp'n* at 5 (quoting *Chauveaux Decl.*; *Griffin Decl.* ¶¶ 2-6). Sometime before the state finals, the MAC contacted the NEA again regarding the same issue and the NEA again advised the MAC that Mr. Monga was ineligible. *NEA Opp'n* at 5-6 (citing *uncorrected NEA Opp'n* Attach. 4 *Decl. of Lauren Miller*, ¶ 3 (*Miller Decl.*)). The MAC declined to enforce the eligibility rule and permitted Mr. Monga to participate in the Maine state finals. *Compl.* ¶ 28. This decision was "[a]gainst direct guidance of the NEA . . . ." *NEA Opp'n* at 2. Accompanied by his teachers and classmates, Mr. Monga performed three poems at the state finals on March 20, 2018. *Compl.* ¶ 30. On March 20, 2018, Mr. Monga won the Maine statewide POL contest. *Id.* ¶¶ 1, 31.

### 5. The National Competition

The national POL competition, for the student champions from every state, the District of Columbia, Puerto Rico, and the United States Virgin Islands, is scheduled to be held in Washington, D.C. on April 23-25, 2018. *Id.* ¶¶ 1, 35. On March 20, 2018, the MAC informed the Mid Atlantic Arts Foundation that Mr. Monga won the state competition but did not meet the eligibility criteria to compete in the national finals.

*NEA Opp'n* at 6 (citing *Chauveaux Decl.*).  On April 4, 2018, and on at least one other occasion, the NEA informed the MAC that Mr. Monga was not eligible to compete in the national finals.  *Id.*; *uncorrected NEA Opp'n* Attach. 5 *Decl. of Rose Jane Chu*, ¶¶ 10-12 (*Chu Decl.*).  The NEA informed the MAC that it would like to invite the Maine POL runner-up to compete in the national finals.  *Unopposed Mot. for Leave to File Corrected Br.* (ECF No. 25) (citing *Chauveaux Decl.*).  Because of the eligibility rule, the Defendants are excluding Mr. Monga from the national POL competition, despite the fact that he won the Maine state POL competition.  In this lawsuit, the Plaintiffs seek to enjoin the Defendants from preventing Mr. Monga from competing in the national competition.  *Pls.' Mot.* at 14 n.7.

## II.    LEGAL STANDARD

"[Injunctive relief]is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012); *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011); *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  To determine whether to issue a temporary restraining order, the Court applies the same four-factor analysis used to evaluate a motion for preliminary injunction.  *Animal Welfare Inst. v. Martin*, 665 F. Supp. 2d 19, 22 (D. Me. 2009); *Faria v. Scott*, No. 16-cv-49-JD, 2016 U.S. Dist. LEXIS 25070, at *1 (D.N.H. Feb. 9, 2016); *Nw. Bypass Grp. v. U.S. Army Corps of Engineers*, 453 F. Supp. 2d 333, 337 (D.N.H. 2006); *Largess v. Supreme Judicial Court for Mass.*, 317 F. Supp. 2d 77, 81

(D. Mass. 2004) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 70 (D. Me. 1993)).  The four factors are:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant]; (3) the balance of the relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)).

"The party seeking [an injunction] bears the burden of establishing that these four factors weigh in its favor."  *Id.* at 18.  The same is true with respect to a TRO.  *Martin*, 665 F. Supp. 2d at 22.  However, "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."  *New Comm. Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *see Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7 (1st Cir. 2012) (confirming that this factor is the "most important part of the preliminary injunction assessment") (citation omitted).  Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of such relief."  *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

Procedurally, the Court is ruling on the motion for TRO, not on the motions for preliminary or permanent injunction.  A motion for TRO may be issued without notice, FED. R. CIV. P. 65(b)(1), but the Plaintiffs here gave the Defendants written notice and the Defendants participated in this proceeding by filing legal memoranda

and by attending oral argument. Therefore the ex parte provisions of Rule 65(b)(1) do not apply.

Nevertheless, before a court issues a preliminary or permanent injunction, Rule 65(a) requires that the adverse party be given notice. FED. R. CIV. P. 65(a). The Rule also contemplates that the court will hold a hearing. FED. R. CIV. P. 65(b)(3). An evidentiary hearing is often desirable, but not essential to the issuance of a preliminary injunction. *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 223 (1st Cir. 2003); *Aoude v. Mobil Oil Corp.*, 862 F.2d 890 (1st Cir. 1988).

Before addressing the motions for preliminary and permanent injunction, the Court will accord the parties an opportunity to present evidence at a hearing as provided in Rule 65 and suggested as desirable by the First Circuit. The Court's procedure here is something of a hybrid between an ex parte motion for TRO and the hearing for motion for preliminary or permanent injunction. To allow briefing and oral argument strikes the Court as more in keeping with notions of fair notice and an opportunity to be heard than an ex parte proceeding would have been.

## III.   THE PARTIES' POSITIONS

### A.   Count I

#### 1.   Likelihood of Success on the Merits

##### a.   Strict Scrutiny

###### i.   The Plaintiffs' Motion

Citing *Graham v. Richardson*, 403 U.S. 365 (1971), the Plaintiffs argue that lawfully admitted aliens, such as Mr. Monga, are a suspect class for equal protection analysis purposes, and that, as such, any governmental regulation that discriminates

against them is subject to strict scrutiny. *Pls.' Mot.* at 7, 9. They state that "[t]he eligibility rule . . . excludes [Mr. Monga] from the POL national competition because of his status as person not born in the United States and not yet entitled to permanently reside here while he seeks asylum, even though he is in all other respects similarly situated to all other contestants." *Pls.' Mot.* at 9. The eligibility rule, thus, is a regulation that discriminates against lawfully admitted aliens.

The Plaintiffs argue that the rule is inherently suspect and subject to strict scrutiny. *Pls.' Mot.* at 9. The Plaintiffs cite caselaw supporting their position, calling particular attention to *Dandamudi v. Tisch*, 686 F.3d 66 (2d Cir. 2012). They state that Mr. Monga "is a legal resident alien of the United States, [] engaged in a public high school education just like high school students who are United States citizens or who are aliens with 'permanent' residency status." *Pls.' Mot.* at 11. They argue that "[a]s an asylum seeker, otherwise holding temporary residency status, he is[ of a minority] 'likely . . . more discrete and insular than' aliens with permanent residency status." *Pls.' Mot.* at 11 (citing *Dandamudi,* 686 F.3d at 77). The Plaintiffs acknowledge caselaw contrary to their position, and they assert that those cases were wrongly decided. *Pls.' Mot.* at 12 n.6 (citing *LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005); *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 537-543 (6th Cir. 2007)).

The Plaintiffs observe that, under strict scrutiny analysis, the eligibility rule is only supportable if the Defendants can show that it is narrowly tailored to serve a compelling state interest. *Pls.' Mot.* at 9, 12. The Plaintiffs assert that the eligibility

cannot survive strict scrutiny review because the Defendants have not identified any compelling governmental interest for excluding a documented alien from the POL program, and that therefore, Mr. Monga's exclusion from the national finals violates his constitutional rights. *Pls.' Mot.* at 7. They argue that the NEA's asserted interest in maintaining its discretion does not constitute a compelling interest. *Pls.' Mot.* at 13. This, the Plaintiffs assert, demonstrates their likelihood to succeed on the merits. *Pls.' Mot.* at 13.

### ii.     The NEA's Opposition[3]

The NEA rejects the proposition that the Court should apply strict scrutiny in its review of the eligibility review. They quote *Matthews v. Diaz*, 426 U.S. 67, 81 (1976) for the principle that "the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." *NEA Opp'n* at 7 (quoting *Diaz*, 426 U.S. at 81). The NEA underscores the *Diaz* Court's admonition that, while all persons are protected under the Fifth Amendment, that "does not lead to the further conclusion that all aliens are entitled to enjoy all of the advantages of citizenship or, indeed, to the conclusion that all aliens must be placed in a single homogeneous legal classification." *NEA Opp'n* at 7 (quoting *Diaz*, 426 U.S. at 78). The NEA goes on to argue, citing caselaw, that while state classifications based on alien status are subject to strict scrutiny, federal classifications based on alien status are evaluated using rational basis review. *NEA Opp'n* at 7.

---

[3]     The Plaintiffs direct Count I toward the NEA and Chairman Chu only. *Compl.* ¶¶ 45, 48. TPF does not take a position on Count I. *TPF Opp'n* at 1 n.1.

The NEA critiques the caselaw the Plaintiffs rely on as inapposite because it applies strict scrutiny to state classifications based on alienage—not federal classifications based on alienage. *NEA Opp'n* at 7-8. The NEA asserts that, even if the Court were to apply strict scrutiny, the eligibility rule would survive and that the Plaintiffs have failed to demonstrate that they are likely to prevail on the merits.

### iii.    The Plaintiffs' Reply

In their reply, the Plaintiffs call the Court's attention to *Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976), in which the Supreme Court found a Civil Service Commission regulation barring legal permanent resident aliens from employment unconstitutionally violated their due process rights. *Pls.' Reply* at 2-3. The Plaintiffs agree with NEA's observation that Congress has the authority to discriminate based on alienage due to its authority to regulate immigration, and that it has enacted many laws charging federal agencies with the duty to do so. *Id*. at 3. They point out, however, that neither the NEA's authorizing statute, nor any federal regulation, nor any other statement of executive branch purpose has indicated that the NEA's programs should be limited to citizens and permanent residents and exclude lawfully resident asylum applicants. *Id*. at 3-4. The Plaintiffs go on to argue that the fact that Congress has not directed the NEA to play a role in the regulation of immigration "reflects a Congressional intent that the NEA should be blind to immigration status in its programs." *Id*. at 3-4.

The Plaintiffs assert that NEA is an arts agency with "absolutely no role with respect to regulation of immigration" that is open to all residents and that, thus, it

"stands on the same legal footing as state governments that discriminate based on alienage." *Id*. at 4. They state that POL "is as much (or more) a state and local government program (with the discriminatory rule imposed upon Mr. Monga checked by the Equal Protection Clause of the Fourteenth Amendment) as it is a federal program (with that rule checked under the parallel equal protection afforded by the Fifth Amendment)." *Id*. at 4.

Citing caselaw, the Plaintiffs argue that the discriminatory treatment of aliens by federal actors "is justified only when there is an overarching national interest at stake and one properly expressed by Congress, the President, or by the agency charged with protecting that interest." *Id*. at 5. They state that NEA has failed to identify such an interest here. *Id*. In doing so, the Plaintiffs argue that the structure of the POL program belies an assertion that is essentially national because it operates largely on funding from TPF and leaves the on-the-ground administration of the curriculum and competitions to TPF, local high schools, state arts agencies and (for the national competition) to another private entity, the Mid Atlantic Arts Foundation. *Id*. at 5. Second, they point out that the legislation establishing the NEA has nothing to do with immigration or naturalization. *Id*. at 5. Third, the Plaintiffs distinguish the other congressional acts that the NEA cites as having no bearing upon the distinct private-state-federal partnership that is the POL program. *Id*. at 5. They also state that those programs "are inapposite for the additional reason that they involve awards or scholarships that *Congress* funds, unlike the POL program and awards, which are mostly funded by [TPF]." *Id*. at 5 n.1 (emphasis in original).

The Plaintiffs also seek to distinguish *Diaz* in that "it involved the eligibility of over 440,000 Cuban refugees who arrived in the United States between 1961 and 1972 to massive federal benefits under [M]edicare part B, clearly a matter of overarching national importance compared to the POL educational and completion program mostly funded by a private foundation." *Id.* at 6 n.2

### b.     Heightened Review

### i.     The Plaintiffs' Motion

The Plaintiffs argue that they prevail even if the eligibility rule is subject to heightened review, rather than strict scrutiny. *Pls.' Mot.* at 14.

They cite the standard applied by the United States Supreme Court in *Plyler v. Doe*, 457 U.S. 202 (1982) which held that exclusion of illegal alien students from public schools must be shown to further "some substantial goal" of the government. *Pls.' Mot.* at 7 (quoting *Plyler*, 457 U.S. at 224); *Pls.' Mot.* at 14-15. The Plaintiffs argue that the Defendants' failure to identify any goal that would be served by the eligibility rule leads to the conclusion that the rule violates Mr. Monga's constitutional rights. *Pls.' Mot.* at 7, 16.

Analogizing to *Plyler*, they go on to argue that Mr. Monga is a member of a disfavored group and that the Defendants' exclusion of him from the national competition forecloses a means by which that group might raise the level of esteem in which it is held by the majority. *Id.* at 15. They contend that exclusion would "mark [Mr. Monga] with a substantial stigma: he will be deemed by the [NEA] and [TPF] to not 'measure up' because of his alien status." *Id.* This, the Plaintiffs assert, would be inconsistent with the tenets of equal protection: "the abolition of

governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit." *Id*.

They point out that "it would make no sense to allow children of undocumented illegal aliens to invoke this heightened rational basis standard when they are denied access to a public education, while denying the same standard to [Mr. Monga], a legal resident alien, when he is being denied the opportunity to participate in a school sponsored program that is an extension of the curriculum provided to him at a public school." *Id*.

### ii. The NEA's Opposition

The NEA argues against application of the level of scrutiny applied in *Plyer* "[b]ecause the mission of the NEA does not involve providing education to children, the agency does not have the ability to deny children that education." *NEA Opp'n* at 8. According to the NEA, the eligibility rule "simply prohibits non-resident aliens from participating in the [POL] State and National finals . . . [and] do[es] not prevent students from participating in poetry classes or competitions at their schools." *Id*. at 8-9. The NEA maintains that, even if the Court were to apply heightened scrutiny, the eligibility rule would pass constitutional muster, and thus the Plaintiffs have failed to demonstrate that they are likely to prevail on the merits.

### iii. The Plaintiffs' Reply

The Plaintiffs reject the NEA's argument that the substantial purpose standard of *Plyler v. Doe* should not apply because *Plyler* only applies to a "basic education" and NEA does not provide education to children. *Pls.' Reply* at 6. In doing

so, they start with the premise that POL is an integral part of the educational program at Deering. *Id.* at 6-7. They underscore that the Agreement between the NEA and TPF explicitly states that TPF will produce "educational materials" for use in schools. *Id.* at 6 (citing *uncorrected NEA Opp'n* Attach. 2 *Decl. of Ann Eilers* (*Eilers Decl.*)). They also point out that the NEA's authorizing statute expressly states that encouragement of "public knowledge, education, understanding and appreciation of the arts" is a core purpose of the agency. *Id.* at 6 (citing 20 U.S.C. § 954(c)(1)).

The Plaintiffs characterize the NEA as contending that a public education may be divided into pieces, some of which is "basic" and accessible by non-citizen students and others that are not "basic" which non-citizens may not access. *Pls.' Reply* at 6-7. They argue that "[s]uch a two-tier system would institutionalize the invidious discrimination that the Supreme Court rejected" in *Plyler*. *Id.* at 7.

### c.     Rational Basis Review
#### i.     The Plaintiffs' Position

The Plaintiffs argue that even if the Court were to apply rational basis review to the eligibility rule, they still are likely to succeed on the merits. *Pls.' Mot.* at 14, 16-17. They state that the NEA has provided no rational basis to support the eligibility rule, which they consider arbitrary. *Pls.' Reply* at 7. They dispute any suggestion that the eligibility rule is justified because the NEA's resources are limited by making three points: "(1) [TPF] and not the NEA provides most of the funding for POL; (2) the cost of the competition is not effected by the immigration status of competitors; and (3) this justification is contrary to the NEA's stated mission of

encouraging "cultural diversity," and "reducing barriers to cultural participation." *Id.* (citing *NEA Opp'n* at 3).

## ii. The NEA's Position

The NEA argues that the eligibility rule survives rational basis review, relying on *Diaz*. *NEA Opp'n* at 9. They point out that NEA has a limited amount of funding, and they claim that "the NEA has discretion to reasonably determine who is entitled to benefit from its programming." *Id.* at 10. They point to provisions in other statutes that limit eligibility to citizens and legal permanent residents. *Id.* at 10-11 (citing *e.g.*, 15 U.S.C. § 3719 (g)(3) (America Competes Act, requiring individuals who win cash prizes in competitions that "stimulate innovation" and that have "the potential to advance the mission of the respective agency" to be a "citizen or permanent resident of the United States"); 42 U.S.C. § 1869(a) (limiting recipients of the National Science Foundation's scholarships and graduate fellowships to "citizens, nationals or lawfully admitted permanent resident aliens of the United States"); 8 U.S.C. §§ 1611(c)(1)(A), 1641 (Personal Responsibility Work Opportunity Reconciliation Act, limiting certain aliens from receiving "any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds  of the United States"); 20 U.S.C. § 955b(b)(3) (directing that the National Medal of the Arts may only be awarded to individuals who are citizens of the United States or "alien[s] lawfully admitted to the United States for permanent residence" who have applied for and are eligible for naturalization). The NEA states that "[a]ccordingly, it is not unreasonable for the NEA to model eligibility criteria based on those that have

obviously been important to Congress over the past several decades." *Id.* at 11. Therefore, the NEA concludes, the Plaintiffs have failed to show that they are likely to prevail on the merits. *Id.*

### 2. Potential for Irreparable Harm to the Movant

#### a. The Plaintiffs' Position

The Plaintiffs argue that Mr. Monga will suffer irreparable harm if he is not permitted to participate in "this once-in-a-lifetime opportunity," *Compl.* ¶ 1, "to demonstrate his artistic prowess on a national stage and to have the chance to compete for the honors awarded in that competition." *Pls.' Mot.* at 7-8. As a result of the Defendants' enforcement of the eligibility rule against Mr. Monga, he faces the prospect of not being able to compete in the national championship to exhibit his creative talents alongside other state champions. *Compl.* ¶ 41. The Plaintiffs argue that the Defendants' eligibility rule and its enforcement leave Mr. Monga unable to access resources to prepare for and attend the national competition. *Pls.' Mot.* at 5. The resources offered to those competitors preparing for the competition, which have been denied to Mr. Monga, include: preparation sessions with local poet coaches and paid travel and accommodations. *Pls.' Mot.* at 5-6; *Compl.* ¶ 41.

The Plaintiffs also contend that Mr. Monga's exclusion from the national competition stigmatizes him as unworthy of his achievement. *Pls.' Mot.* at 5. They also argue that unlike the other state champions, Mr. Monga is being denied "the security of knowing that they will be welcome at the national finals, with their participation announced on the NEA website." *Id.* at 6; *see Decl. of Allan Monga* (*Monga Decl.*) Attach. 4 *List of State Champions* (ECF No. 4).

The Plaintiffs also assert that "a violation of an individual's constitutional rights has been held to constitute irreparable harm per se." *Pls.' Mot.* at 8, 13 (citing *Henry v. Greenville Airport Comm'n*, 284 F.2d 631 (4th Cir. 1960)).

The Plaintiffs characterize Mr. Monga's harm "the primary harm," however, they assert that PPS "has an important interest in ensuring that all of its students, regardless of their immigration status, are permitted to participate and excel in programs that the school department offers and promotes." *Pls.' Mot.* at 8 n.5.

### b. The NEA's Position

The NEA argues that any harm the Plaintiffs suffered was self-inflicted because they were aware well before the state finals that Mr. Monga was ineligible to compete in both the state and national finals based on the NEA's eligibility criteria. *NEA Opp'n* at 12. Therefore, the NEA states, the Plaintiffs "had ample opportunity to challenge the NEA's eligibility criteria in advance of the state finals. That there is now only one week until the national finals cannot be deemed to inflict irreparable harm on Plaintiffs, as any potential harm stems in large part from their delay." *Id.* at 13.

### 3. Balance of the Relevant Impositions
### a. The Plaintiffs' Position

The Plaintiffs assert that, if emergency injunctive relief for the Plaintiffs were to issue, the "Defendants w[ould] suffer no harm at all." *Compl.* ¶ 1. The Plaintiffs say that this stands in stark contrast to the harm Mr. Monga stands to endure already described.

### b. The NEA Position

The NEA claims that an injunction would cause "NEA's ability to carry out its statutory mandate [to] be injured and the NEA [to] be forced to compromise the integrity of the P[OL] competition." *NEA Opp'n* at 2. The NEA asserts that the injunction the Plaintiffs pray for "would threaten the ability of the NEA to administer its initiatives, thereby impairing its ability to create funding partnerships with private entities and compromising the integrity of the National Finals." *Id*. at 13. It goes on to claim that injunctive relief would "call into question the NEA's longstanding use of similar criteria in administering its initiatives, including its grant-making activities, and impair the agency's work to fulfil its mission." *Id*. at 13-14 ; *Chauveaux Decl*. ¶¶ 36-51). According to the NEA this would, in turn, harm the NEA's ability to seek partnerships for funding with private entities, who rely on the NEA's consistent administration of its programs. *Id*. at 14.

NEA also states that "a finding that the NEA's eligibility criteria are invalid would also jeopardize the integrity of the National Finals." *Id*. The NEA also asserts that injunctive relief would force it to "impose harm on the runner-up competitor from Maine, who is eligible under the rules of the competition and who would otherwise have the opportunity to compete at the National Finals." *Id*. The NEA also speculates that an injunction would harm any other students who were previously unable to participate in POL competitions due to the eligibility rule. *Id*.

### 4.    The Effect of the Ruling on the Public Interest

The Plaintiffs argue that "the public interest in the education of all residents of this country and the importance of conducting a public educational program that is fair, equitable and truly merit-based will be promoted by allowing [Mr. Monga] to

participate in the competition." *Pls.' Mot.* at 8. The Plaintiffs argue that the Defendants' eligibility rule and its enforcement stigmatizes Mr. Monga as unworthy of his achievement. *Id.* at 5.

The Plaintiffs also assert that "vindication of a constitutional right is self-evidently in the public interest." *Id.* at 13 (citing *Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004); *Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)).

## B. Count II[4]

### 1. TPF's Position

TPF bases its opposition to Count II entirely on its position that the Plaintiffs cannot show a likelihood of success on the merits. *TPF Opp'n* at 1-3. Specifically, TPF asserts that "Title VI applies only to a party who receives some form of federal financial assistance," and that "[b]ecause [TPF] is a privately-funded organization that does not seek or accept any federal funding," Count II is fatally flawed. *Id.* at 2.

### 2. The Plaintiffs' Position

At oral argument, the Plaintiffs conceded that they do not have any evidence that TPF receives federal financial assistance. They further conceded that, absent such evidence, they probably cannot sustain their claim against TPF; however, they did not concede that their legal action against TPF necessarily fails because they wish to engage in discovery to confirm TPF's representations.

---

[4] The Plaintiffs direct Count II against only TPF. *Compl.* ¶¶ 51, 52, 55. The NEA argues that, to the extent the Plaintiffs intend to bring their Title VI claim against the NEA and Chairman Chu, they have failed to demonstrate a likelihood of success. *See NEA Opp'n* at 11-12. Because the Plaintiffs direct Count II only to TPF, the Court does not address the NEA's argument.

## IV. DISCUSSION

### A. Time Constraints

At the initial telephone conference on April 13, 2018, the Court suggested to the parties that, given the extreme time constraints, it would be preferable if the parties agreed to an interim resolution that would permit Mr. Monga to attend the national competition and preserve the merits of the legal issues for later. The reason is obvious. The legal issues here are complex and merit thorough briefing and conscientious deliberation.

Unfortunately, the parties were unable to arrive at an agreement to allow for a more contemplative, better researched, and more thorough decision. The motion was submitted to the Court on April 11, 2018 and the parties asked for a decision by April 20, 2018. The Court has done its level best, but the parties should appreciate "the temporal constraints under which the district court labored" in arriving at its decision.[5] *Bl(a)ck Tea Soc'y*, 378 F.3d at 15.

### B. Count II— Violation of the Civil Rights Act of 1964

---

[5] The NEA argued that the PPS was itself responsible for the delay that led to this compressed timeframe. Attorney Bruce Smith, counsel for the Plaintiffs, reached out to the NEA to discuss the legal basis for eligibility rule as early as March 13, 2018. *Decl. of Bruce Smith* at 2 (ECF No. 6); *Id.* Attach. 1 *E-mail to NEA.* Attorney Smith and the NEA corresponded a variety of times over the course of subsequent weeks. *Id.* Attachs. 2-6. The day after Mr. Monga won the state finals, Attorney Smith inquired with the NEA about Mr. Monga's ability to participate in the national finals. *Id.* Attach. 4. Not until April 4, 2018—over three weeks after Attorney Smith's initial outreach—did NEA provide any substantive response. *Id.* Attachs. 7-8. NEA directed Attorney Smith to the MAC, which was in receipt that day of a letter indicating Mr. Monga's ineligibility but silent regarding any legal foundation for the rule. *Id.* The Plaintiffs filed their Complaint a week after this first substantive response.

Even though PPS and NEA point to each other, the Court need not decide who caused the extreme time constraint that the Court and the parties have operated under. The reason is that there is no suggestion that Mr. Monga, as opposed to PPS or NEA, was personally responsible for any of the delay, and the Court is issuing an injunction in favor of Mr. Monga, not PPS.

### 1.    The Likelihood of Success on the Merits

Title VI of the Civil Rights Act of 1964 prohibits recipients of federal financial assistance from discriminating on the basis of race, color, or national origin. 42 U.S.C. § 2000d *et seq*. Without evidence that an organization receives at least some federal money, however, any claim asserted under Title VI will fail as a matter of law. *See Manuel v. City of Bangor*, 2009 U.S. Dist. LEXIS 98029 at *11 (D. Me. Oct. 21, 2009) (identifying legal insufficiency in the plaintiffs' claims because they failed to allege that the defendant bank received any federal financial assistance).

Plaintiffs' Title VI claim, which they bring against TPF only, is unlikely to succeed because TPF presented the Court with evidence that it does not receive any federal financial assistance. *Decl. of Caren Skoulas* ¶ 2 (ECF No. 22) (*Skoulas Decl.*). Established in 2003 with a gift of nearly $200 million from a private philanthropist, TPF states that it operates without any federal funding. *Id.* ¶¶ 2, 4. TPF accepts donations from private individuals and organizations; however, none of these contributions comes from not-for-profit organizations or state-run programs that accept federal funding. *Id.* ¶ 6. Although TPF partners with the NEA to support POL, TPF only provides—and does not receive—financial assistance in that partnership. *Id.* ¶¶ 2, 6. At oral argument, the Plaintiffs conceded that they lack any evidence to the contrary and that, absent such evidence, they could not sustain Count II against TPF.

The Court concludes that the Plaintiffs failed to demonstrate a likelihood of success on the merits against The Poetry Foundation. *See Newton v. LePage*, 789 F.

Supp. 2d 172, 179 (D. Me. 2011) ("[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity" (internal citation omitted)). Accordingly, the Court denies the Plaintiffs' request for injunctive relief against TPF. The parties are, however, in agreement that the denial of injunctive relief against TPF does not affect the merits of the motion for TRO against the remaining Defendants.

## C. Count I— Violation of Fifth Amendment Equal Protection

### 1. The Likelihood of Success on the Merits

#### a. Level of Review that Applies

An important threshold issue the parties dispute is the proper level of scrutiny the Court should apply in its review of the eligibility rule. The Plaintiffs argue for application of strict scrutiny, while the NEA argues for application of rational basis review. The Court determines that heightened review is most appropriate for its consideration of the eligibility rule.

"[A]liens are entitled to equal protection of the law under the Fifth Amendment." *Kandamar v. Gonzales*, 464 F.3d 65, 72 (1st Cir. 2006). "Alienage, like race and nationality, constitutes a suspect classification under the Fourteenth Amendment." *Bruns v. Mayhew*, 750 F.3d 61, 66 (1st Cir. 2014) (citing *Graham v. Richardson*, 403 U.S. 365, 376 (1971)). "Because '[a]liens as a class are a prime example of a "discrete and insular" minority,' a state's alienage-based classifications inherently raise concerns of invidious discrimination and are therefore generally subject to strict judicial scrutiny." *Id.* (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152-53 n.4 (1938)). However, as the First Circuit explained, the

"calculus is markedly different for *congressional* acts distinguishing on the basis of alienage, evaluated under the Due Process Clause of the Fifth Amendment." *Id.* (emphasis in original). This is because "congressional disparate treatment of aliens is presumed to rest on national immigration policy rather than invidious discrimination." *Id.*

The Plaintiffs urge the Court to adopt a strict scrutiny analysis consistent with *Dandamundi v. Tisch*, 686 F.3d 66, 70 (2d Cir. 2012) and a series of similar federal cases. But these cases all deal with state legislation or regulation based on alienage, which, as the First Circuit has taught, would be subject to strict scrutiny analysis. The Plaintiffs have provided no example of a case that held a federal statute or policy based on alienage subject to strict scrutiny analysis and the Court declines to follow precedent that applies to state, not federal government.

By contrast, courts adjudicating challenges to federal laws or regulations enacted under the aegis of immigration, naturalization, and/or foreign affairs apply rational basis review. *E.g., Adams v. Baker*, 909 F.2d 643, 647 (1st Cir. 1990) ("Nowhere is the scope of judicial inquiry more limited than in the area of immigration legislation"); *Herrera-Inirio v. I.N.S.*, 208 F.3d 299, 308 (1st Cir. 2000); *Bruns*, 750 F.3d at 66; *United States v. Lopez-Flores*, 63 F.3d 1468, 1475 (9th Cir. 1995) ("Federal legislation that classifies on the basis of alienage, enacted pursuant to Congress' immigration or foreign policy powers, is therefore subject to the lowest level of judicial review"). This comports with the long-standing tenet that the political branches of the federal government wield substantial power in those spheres. *Toll v.*

*Moreno*, 458 U.S. 1, 10-11 (1982); *Diaz*, 426 U.S. at 81, 81 n.17 (foreign relations are "exclusively entrusted to the political branches," thus when policies toward aliens interact with foreign relations, the policies toward aliens are "largely immune from judicial inquiry or interference" (internal quotation and citations omitted)) ; *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("Our cases have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control") (internal quotation and citations omitted). Thus, if the eligibility rule dealt with immigration, naturalization, and/or the conduct of foreign affairs, the case for rational basis review would be stronger.

But it does not. Although the NEA eligibility classification touches on alienage, the core activity—a poetry reading competition—has nothing to do with federal control of immigration. Instead, the poetry reading competition involves education. At this point, the Court turns to *Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976) for instruction. In *Hampton*, the Supreme Court declared unconstitutional a United States Civil Service Commission rule that excluded lawfully admitted resident aliens from employment in the federal competitive civil service. *Id.* at 116. In arriving at its conclusion, the *Hampton* Court wrote:

> We do not agree, however, with the [Civil Service Commission's] primary submission that the federal power over aliens is so plenary that any agent of the National Government may arbitrarily subject all resident aliens to different substantive rules from those applied to citizens. We recognize that the [Civil Service Commission's] argument draws support from both the federal and the political character of the power over immigration and naturalization. Nevertheless,

countervailing considerations require rejection of the extreme position advanced by the [Civil Service Commission].

*Id.*

The principle annunciated in *Hampton* is reflected in subsequent caselaw. Courts adjudicating challenges to federal laws closely related to immigration, naturalization, and foreign policy interests tend to employ rational basis review. *E.g., Lopez-Flores*, 63 F.3d at 1473-74 (9th Cir. 1995) (applying rational basis review because foreign policy concerns, including the "threat of in-country terrorist attacks and the desire to meet the United States' obligations under international treaties[,] provided the impetus for passage of [the challenged statute,] the Hostage Taking Act"). The further the challenged law, regulation, or policy from the core federal interests in immigration and foreign affairs, the more searching the judicial review. *E.g., De Malherbe v. Int'l Union of Elevator Constructors*, 438 F. Supp. 1121, 1135 (N.D. Cal. 1977) (declining to indicate a level of review in case of alleged hiring discrimination based on alienage, but stating "If in fact defendants discriminated against plaintiff because of his noncitizenship and if in fact that discrimination constituted federal action, defendants must show that some legitimate interest of theirs was furthered by that discrimination"). Here, based on *Hampton* and its progeny, the Court concludes that a more searching judicial analysis than mere rational basis and a less searching judicial analysis than strict scrutiny is appropriate for the NEA policy in this case.

This leads to an additional observation. As noted above, the *Bruns* Court was careful to note that "the calculus is markedly different for *congressional* acts

distinguishing on the basis of alienage." *Bruns*, 750 F.3d at 66. Here, although the NEA references federal statutes as suggestive of congressional intent, there is no congressional enactment that requires it to impose these citizenship or permanent resident requirements to the POL competition. If the Court were dealing with a duly enacted federal statute, the calculus, as the First Circuit wrote, would be different. Thus, in the Court's view, *Diaz* is not dispositive. *Nyquist v. Mauclet*, 432 U.S. 1, 7 n.8 (1977) (citing *Diaz*, 426 U.S. at 84-87 ("The appellants can draw no solace from [*Diaz*], however, because the Court was at pains to emphasize that Congress, as an aspect of its broad power over immigration and naturalization, enjoys rights to distinguish among aliens that are not shared by the States").

The NEA distinguishes *Hampton* by pointing out that a fundamental liberty interest was at stake there: the right to employment. While that is true of *Hampton*, it leads the Court to consider the interest at stake in this case: public education. The Plaintiffs persuasively cite a case in which the Supreme Court considered the availability of public education to undocumented alien children: *Plyler v. Doe*, 457 U.S. 202 (1982).

The *Plyler* Court determined that by denying undocumented school-aged children the free public education it provided to children who were citizens of the United States or legally admitted aliens, Texas violated the undocumented children's equal protection rights. *Plyler*, 457 U.S. at 230. In doing so, the Supreme Court reasoned that "[i]f the State is to deny a discrete group of innocent children the free public education that it offers to other children residing within its borders, that denial

must be justified by a showing that it furthers some substantial state interest." *Id*. The *Plyler* Court also stated that "denial of education to some isolated group of children poses an affront to one of the goals of the Equal Protection Clause: the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit." *Id*. at 221-22.[6]

The NEA correctly pointed out that the Supreme Court was careful in *Plyler* not to describe a free public education as a constitutional right. *Id*. at 221 ("Public education is not a 'right' granted to individuals by the Constitution"). However, the *Plyler* Court went on to write that "neither is it merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation." *Id*. The Supreme Court emphasized the "importance of education in maintaining our basic institutions, and the lasting impact of its deprivation on the life of the child" and education's "fundamental role in maintaining the fabric of our society." *Id*.

While *Plyler* dealt with wholesale denial of education by a state, a circumstance not present here, the Plaintiffs have demonstrated an education nexus in this case. *E.g., Chauveaux Decl.* ¶ 20 (POL administration includes "holding teacher training workshops [and] distributing educational materials"). POL is part and parcel of the educational program at Deering. Deering faculty have integrated it into the curriculum and their lesson plans. *See Decl. of Gregg Palmer* ¶¶ 5-6 (ECF No. 5) (*Palmer Decl.*). It is part of the instruction students receive in the core subject

---

[6]     In *Nyquist v. Mauclet*, 432 U.S. 1 (1977), the Supreme Court, applying strict scrutiny, held that a New York statute barring resident aliens from state financial assistance for higher education violated those resident aliens' equal protection rights.

of English. The program has a connection to the federal umbrella even at the classroom- and school-wide competition levels. The POL Teacher's Guide, produced by NEA and TPF, discusses how POL "can be folded into an existing curriculum, and meets NCTE and Common Core Standards." *Palmer Decl.* Attach. 2 *Poetry Out Loud Teacher's Guide*, at 3[7] (ECF No. 5) (*POL Teacher's Guide*). The Guide provides detailed guidance about how teachers can integrate the program into their lesson plans, *id*. at 5-6, and it specifies which particular NCTE and Common Core Standards POL meets. *Id*. at 22-23.

The Court acknowledges that the further from the classroom, the less convincing the link to *Plyler*'s concern about public education and the more like an extracurricular and voluntary activity, especially since the range of extracurricular activity can be extremely broad. Even so, on this hasty record for purposes of the TRO, the Court is not convinced that POL falls outside the realm of education once a successful student-competitor rises to state and national competitions.[8]

The Supreme Court has instructed that a heightened standard of review is proper for classifications based on characteristics "beyond the individual's control and bearing no relation to the individual's ability to participate in and contribute to society," such as gender and illegitimacy. *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 440-41 (1985). Because the exclusion of Mr. Monga from the

---

[7]     The Court uses the pagination of the POL Teacher's Guide itself, not the PDF document.

[8]     The NEA cites *Palmer v. Merluzzi*, 689 F. Supp. 400 (D.N.J. 1988) for the proposition that rational basis review is appropriate. The *Palmer* Court underscores some of the reasons why the case is inapposite here: it involved a challenge to a clearly extracurricular activity (a high school football team); and (2) it did not involve a suspect classification. *Palmer*, 689 F. Supp. at 413.

national finals is based on a characteristic with similar facets and because the exclusion implicates the denial of a curricular aspect of his public education, the Court applies a heightened standard of review to the eligibility rule.

### b.    Applying Heightened Review

Having decided that a harder look than rational basis review is warranted, the Court can now assess the Plaintiffs' likelihood of success on the merits. Particularly given the urgency with which the Court had to consider the issues, the Court emphasizes that this assessment is not dispositive of success on the merits. *See Narragansett Tribe v. Gilbert*, 934 F.2d 4, 6 (1st Cir. 1991) ("a court's conclusions as to the merits of the issues presented on preliminary injunction are to be understood as statements of probable outcomes. Thus, a party losing the battle on likelihood of success may nonetheless win the war at a succeeding trial on the merits" (internal citations omitted)).

Under the heightened review rubric applied in *Plyler*, the Court must determine whether the eligibility rule furthers a substantial government interest. The Court begins with identification of such an interest.

One of the NEA's identified interests is maintenance of discretion to allocate its limited resources as it sees fit—including preventing anyone who is not a United States citizen of legal permanent resident from receiving benefits derived from those resources. The NEA stated that it contributed $195,000 to the POL competition. TPF contributes about $500,000. The extent to which the NEA's financial commitment

33

justifies the eligibility requirement bears further investigation, but it does not drive the result on this motion.

The NEA claims that injunctive relief for the Plaintiffs would jeopardize its appropriations from Congress and funding it receives from private partners. The NEA's assertions do not persuade the Court. Counsel for TPF, one such private partner, stated at oral argument that the TPF would welcome Mr. Monga's participation in the national finals and that his participation would present no problems from TPF's perspective.

The NEA points to instances wherein Congress has limited eligibility for certain grants, prizes, and scholarships, including the National Medal for the Arts, to citizens and legal permanent residents. Although perhaps suggestive of generalized congressional intent, it is also true that Congress did not draw such a line for the POL competition. It is always tempting to draw conclusions about congressional intent from what Congress has said or has not said in other contexts. But these arguments at least merit further development. At this stage, the Court does not find either convincing. NEA notes that it is almost entirely dependent upon Congress for its funding and asserts that therefore, "it is not unreasonable for the NEA to model eligibility criteria based on those that have obviously been important to Congress over the past several decades." *NEA Opp'n* at 11. The NEA, which draws much of its funding from Congress, has a right to be concerned about following congressional directives, but the Court is not convinced on this record that Congress has directed either explicitly or implicitly the eligibility requirements for the POL

competition that the NEA has adopted. Accordingly, the Court determines that the Plaintiffs have shown a likelihood of success.

## 2. Potential for Irreparable Harm to the Movant

"If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) (internal citations omitted). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).

The Court readily finds that Mr. Monga would be irreparably harmed if he were not permitted to take advantage of the unique, fleeting, one-time opportunity he has earned: to participate in the POL national finals alongside his fellow state champions. Courts have found such one-time opportunities to constitute irreparable harm. *E.g., Stanton By and Through Stanton v. Brunswick School Dept.*, 577 F. Supp. 1560, 1567-68 (D. Me. 1984) ("Money damages will not suffice to redress such a deprivation of Plaintiff's one-time opportunity to have her ideas published in the yearbook, which opportunity has been made available to her classmates"); *Reynolds v. Int'l Amateur Athletic Fed'n*, 505 U.S. 1301, 1302 (1992) (reinstating preliminary injunction to allow athlete to compete in 1992 United States Olympic Trials and finding potential for irreparable harm due to "incomparable importance of winning a gold medal in the Olympic Games,"); *Revels v. Miss Am. Org.*, No. 7:02CV140-F(1),

2002 WL 31190934, at *7 (E.D.N.C. Oct. 2, 2002) ("once-in-a-lifetime opportunity" to compete in the Miss America pageant national finals with the "chance to be Miss America, a national icon"). Given this quintessential harm that cannot be measured nor redressed by damages, this factor clearly weighs in favor of Mr. Monga.

The NEA does not contest the harm itself; rather, it argues that the harm is not cognizable because it is "self-inflicted." NEA points to communications it had with the MAC in advance of the Maine state finals indicating that Mr. Monga was ineligible to participate and suggests that the Plaintiffs' alleged foreknowledge of the harm either precludes them from having it redressed via injunctive relief and/or leads to a conclusion that they were tardy in filing suit. As the Court noted earlier, these arguments may be valid against PPS, which the Court views as in a very different position from that of Mr. Monga. But there is no evidence in this record that would allow the Court to ascribe PPS's knowledge of the NEA eligibility rules to Mr. Monga or find that Mr. Monga caused himself a self-inflicted harm merely by participating in this competition.

### 3. The Balance of the Relevant Impositions

The NEA argues that an injunction in favor of Mr. Monga would harm any individuals who wanted to participate in POL but declined to do so because they were excluded by the eligibility rule. Although NEA is free to develop this argument, it is without any record support and amounts to speculation.

The NEA claims that a grant of the relief the Plaintiffs seek would undercut the integrity of the national finals. It is difficult to understand how. Mr. Monga is

the POL Maine state champion. Allowing him to compete with champions from other states and to be fairly judged on the merit of his performance would not appear to undermine the integrity of the competition.

The NEA also asserts that an injunction would be an affront to its discretion in administration of its programs. The NEA has not persuaded the Court that to the extent an injunction would impinge on the NEA's discretion that such an imposition outweighs the harm Mr. Monga stands to suffer if he were disallowed from competing.

The NEA speaks of its priorities, including "artistic and cultural significance, giving emphasis to American creativity and cultural diversity." *Defs.' Opp'n* at 3 (quoting 20 U.S.C. § 954(c)(1)). It also describes the state art agencies to which it makes grants, such as the MAC, as being "charged with reducing barriers to cultural participation . . . ." *Defs.' Mot.* at 3. It would seem that the participation of Mr. Monga, a talented young man raised in Zambia, in the national finals as an outcome that actually advances these priorities. The Court finds that the balance of the relevant impositions tips toward Mr. Monga.

### 4. The Effect of the Ruling on the Public Interest

The Court acknowledges the arguments of both sides with respect to the impact an injunction would have on the public interest. However, in the unique circumstances presented in this case, allowing Mr. Monga to compete in the POL national finals strikes the Court as outweighing the more generalized goals the NEA points to. As such, the Court finds that this factor tips in favor of the Mr. Monga.

Having determined that each of the four factors relevant to the issuance of emergency injunctive relief weighs in favor of allowing Mr. Monga to participate in the POL national finals, the Court concludes that such relief is warranted in this unique case. The Court leaves for a future date, when time constraints are not so pressing, a more measured and sober determination, informed by further argument from the parties, of the important issues at stake in this case.

### D.    Portland Public Schools

As the Court intimated, it sees PPS' involvement in this case as markedly distinct from Mr. Monga's. The Court has doubts about whether PPS would have standing to obtain a TRO on behalf of Mr. Monga. It views PPS as having greater knowledge of the eligibility requirements of the NEA program than can fairly be imputed to Mr. Monga. PPS's stated interest in assuring that future students, including those who are neither citizens nor permanent residents, will be allowed to participate in future POL competitions is a markedly different proposition than Mr. Monga's immediate desire to participate in next week's competition. In short, the Court's ruling in favor of Mr. Monga is not a harbinger of rulings to come, one way or the other. Finally, as the Court has granted relief to Mr. Monga, it is not necessary to grant the same relief to PPS.

## V.    CONCLUSION

The Court DENIES the Plaintiffs' Motion for Temporary Restraining Order against The Poetry Foundation (ECF No. 3). The Court GRANTS Allan Monga's Motion for Temporary Restraining Order (ECF No. 3) insofar as it seeks to require

the NEA and Chairman Chu to allow Mr. Monga to participate in the Poetry Out Loud national finals competition in Washington, D.C., beginning on April 23, 2018. The Court DISMISSES without prejudice as moot Portland Public School's Motion for Temporary Restraining Order (ECF No. 3).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 21st day of April, 2018